Gerard P. Fox (SBN 151649)
 gfox@gerardfoxlaw.com
Marina V. Bogorad (SBN 217524)
 mbogorad@gerardfoxlaw.com
Lauren M. Greene (SBN 271397)
 lgreene@gerardfoxlaw.com
Gerard Fox Law P.C.
1880 Century Park East, Suite 1410
Los Angeles, CA 90067
Telephone:   (310) 441-0500
Facsimile:   (310) 441-4447

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BMG RIGHTS MANAGEMENT (US) LLC, a Delaware limited liability company, | Case No.: 2:18-cv-3723-VAP-JEM |
| Plaintiff, | **DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT, OR, ALTERNATIVELY, FOR AND ORDER IDENTIFYING MATERIAL FACTS NOT GENUINELY IN DISPUTE RE LIABILITY AND WILLFULNESS** |
| v. | |
| GLOBAL EAGLE ENTERTAINMENT INC., a Delaware corporation; INFLIGHT PRODUCTIONS LTD, a UK private limited company; and DOES 1-10, inclusive, | |
| Defendants. | |

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.  Expert's Qualifications ...................................................................1

II.  Expert Assignment ........................................................................5

III.  Summary of Expert Opinions ......................................................6

IV.  The Facts Considered, The Opinions Expressed Herein and the Basis and Reasons for them ...........................................................................7

   A.  Facts Considered .....................................................................7

   B.  Licenses Under Copyright Required by IFP ...........................9

      1.  Musical Work Licenses ......................................................11

         *a.*   *Server Copy Licenses*..........................................*11*

         *b.*   *Distribution or Importation Licenses* ...............*14*

         *c.*   *Public Performance Licenses* ..........................*15*

         *d.*   *Typical Terms of In-Flight Licenses for Musical Works 17*

      2.  Sound Recording Licenses ................................................19

         *a.*   *Master Use Licenses* ........................................*19*

         *b.*   *Distribution or Importation Licenses* ...............*20*

         *c.*   *Public Performance Licenses* ..........................*20*

         *d.*   *Typical Terms of In-Flight Licenses for Sound Recordings* ................................................................*22*

      3.  Cover Art Licenses ............................................................23

   C.  IFP's Overseas Licenses Are Not Applicable in the U.S.......23

   D.  Trier of Fact Could Find Infringement Was Willful ..............24

IV.  Response to Mr. Smith's Report.................................................27

   A.  IFP Could Not Have Reasonably Relied on License Agreements from Rights Organizations Outside of the United States to Permit IFP to

Reproduce, Distribute or Publicly Perform BMG's Copyrighted Works Inside the U.S. ........................................................................27

1.  The foreign agreements Mr. Smith cites that purportedly permit the public performance of BMG's copyrighted works (i) do not permit IFP to publicly perform such works outside the territory covered by such licenses and (ii) do not permit IFP to reproduce or distribute such works anywhere in the world................................................31

2.  The foreign agreements Mr. Smith cites that purportedly permit the reproduction and distribution of BMG's copyrighted works (i) do not, in fact, permit IFP to reproduce or distribute such works outside the territory covered by such licenses and (ii) do not, in fact, permit IFP to publicly perform such works anywhere in the world.........32

3.  The foreign agreements Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's musical works do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted sound recordings anywhere in the world,..................................................34

4.  The foreign agreements Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's sound recordings do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted musical works anywhere in the world..................................................36

5.  The foreign agreements Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's copyrighted works outside of the United States does not include a license to import any such works into the United States. .............37

B.  That an Airline May Have Breached its Agreement with IFP by Failing to Procure a Public Performance License Does Not Absolve IFP of its Liability for Copyright Infringement. ......................................................38

C.  ████████████████████████████████████████
    ████████████████████████████████████████
    ████████████ ................................................................39

D.  If IFP Had Wished to Ensure Compliance with U.S. Copyright Law, It Could Simply Have Withheld the Use of BMG's Songs and Recordings Until It Obtained the Required Licenses ................................................40

V.  Response to Mr. Torremans's Expert Rebuttal Report ......................................41

A.  Whether IFP Reproduced Phonorecords of BMG's Works "from 2014 to the present" Solely Outside of the United States Is a Question of Fact; IFP Is Not Refuting BMG's Allegation that IFP Did Reproduce Phonorecords of BMG's Works Inside the United States Prior to 2014 ......................42

B.  Whether Procuring a Public Performance License Was the Responsibility of IFP's Airline Clients Is Irrelevant Except Insofar as IFP May Have An Action Against Its Clients for Failing to Do So. ....................................43

C.  IFP Required a License to *Import* BMG's Works into the United States, Even if During the Relevant Period (i) All of IFP's Reproduction of BMG's Copyrighted Works Occurred Outside of the United States and (ii) IFP had Procured All Necessary Valid Licenses to Publicly Perform Such Works in the United States. ....................................................44

Pursuant to 28 U.S.C. § 1746, I, Bob Kohn, declare as follows:

1.     I am over 18 years old and competent to testify to these matters.

## I.   Expert's Qualifications

2.     I am an attorney licensed to practice in California and before the Second Circuit Court of Appeals. My expertise includes business customs and practices within the music publishing, recording and entertainment industries, particularly with respect to the acquisition and licensing of rights in musical compositions and sound recordings, and the customs and practices observed in connection with such transactions. I have an LL.M degree from Columbia Law School, earning highest honors (James Kent Scholar), where I also was a Visiting Scholar, conducting independent academic research, auditing classes, and attending seminars including those which concerned advanced issues in copyright and music law (2016-2017).

3.     I am the author of *Kohn On Music Licensing,* 5th Edition (Wolters Kluwer, 2019)*,* a treatise of over 1,800 pages which, among other things, addresses various types of publishing and recording agreements both domestically and internationally, including music industry customs and practices concerning the licensing of musical works and sound recordings for distribution and delivery in physical and digital formats.

4.     Since the book's first publication in 1992, I have written several updates, released in 1996, 2002, 2010, and most recently, in 2019. In preparation for each new edition, I attend conferences, provide expert testimony (including legislative and regulatory guidance for the U.S. Copyright Office[1]), and continually consult with professionals from virtually every corner of the music industry who provide me with information about evolving industry practices and licensing trends, some of which they would be reluctant to share with industry colleagues for antitrust reasons. The 5th

---

[1] *See, for example,* "Copyright and the Music Marketplace: A Report of the Register of Copyrights," U.S. Copyright Office (February, 2015) (wherein *Kohn On Music Licensing* or this writer's comments submitted to the Copyright Office was cited over 25 times in support of many changes later included in in the Music Modernization Act of 2018).

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Edition of *Kohn On Music Licensing,* which updates customs and practices described in virtually every chapter, including a lengthy discussion of Music Modernization Act of 2018, was published in February, 2019.

5.      *Kohn On Music Licensing* was cited by the U.S. Supreme Court in *Eldred v. Ashcroft*, 537 U.S. 186, fn. 21 (2003) for entertainment-industry business practices concerning the assignment of copyrights. It also was quoted at length in in *Bridgeport Music v. Dimension Films*, 410 F.3d 792, fn. 18 (6th Cir. 2005), concerning industry customs and practices in the use of digital samples of existing sound recordings in new sound recordings. In *Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995) and *Boosey & Hawkes Music Publishers, Ltd. v. Buena Vista Home Video*, 145 F.3rd 481 (2d Cir. 1988), the treatise was cited for industry practices concerning performance rights administered by ASCAP. In *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.* 958 F.Supp. 170 (1997), aff'd 155 F.3d 17 (2d Cir. 1998), the book was cited with approval regarding the interpretation of the scope of mechanical licenses issued by the Harry Fox Agency.

6.      Upon graduating from Loyola Law School, Los Angeles in 1981, I became an associate attorney for the Law Offices of Milton A. "Mickey" Rudin, who represented, among others, Frank Sinatra, Liza Minelli, Cher, Steely Dan, Irvin Azoff, Warner Bros. Music, Warner Bros. Publications, 20th Century Fox Studios, and other entertainment industry clients. One of my responsibilities there was to participate in the drafting of a new set of standard form music synchronization licenses for Warner Bros. Music. I also licensed numerous musical works and sound recordings for our motion picture producer clients, including Front Line Management, Inc., owned by Irving Azoff, who co-produced the film *Fast Times At Ridgemont High.*  I filed a lawsuit on behalf of Frank Sinatra to enjoin the unauthorized use of his likeness in a commercial advertisement. During that time, and for several years thereafter, I served as an Associate Editor of the Entertainment Law Reporter.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

7.      In 1998, I founded and became Chairman of EMusic.com, Inc. (NASDAQ: EMUS), a pioneering digital music download company which, in July, 1998, began selling for 99 cents the permanent download of digital files containing sound recordings in the MP3 format. Serving as chief legal counsel for EMusic, I drafted and negotiated all of the early license agreements by which we eventually licensed nearly a million sound recordings and the musical works embodied in them from hundreds of independent record labels, and hundreds of major and independent music publishers, both directly and through the Harry Fox Agency. During that time, I made numerous presentations to representatives of the U.S. government, including as the Federal Trade Commission, the Department of Justice, and members of the U.S. Senate and House of Representatives, regarding emerging digital technologies affecting the digital transmission and delivery of sound recordings and musical works. I also testified before the European Union on the subject of music licensing for the Internet, copyright protection, and cross-border transactions in digitally transmitted music. EMusic was acquired by Universal Music Group in 2001.

8.      In 2005, I founded RoyaltyShare, Inc., a provider of revenue and royalty processing services that assists record companies with discharging their royalty obligations to recording artists, record producers, and music publishers.

9.      In 2002, I testified as an expert for Sony Music Entertainment regarding the validity of a copyright in a musical work alleged to have been infringed by the Dixie Chicks. *Albert E Brumley & Sons, Inc. v. Sony Music Entertainment, Inc.*, Case No. 3:00-cv-05110-RED (2000).

10.     In 2007, I testified before late Judge William C. Conner, Sr. on behalf of ASCAP to inform the court on how musical works and sound recordings are used on the Internet, including their use on services such as AOL, RealNetworks, and Yahoo! *See*, *United States v. ASCAP in the Matter of America Online, Inc., RealNetworks, Inc., and Yahoo!, Inc.*, 559 F.Supp.2d 332 (2008).

-3-

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

11.   In 2009, I testified as an expert for Warner Music Group in *Zappa v. Rykodisc, Inc.,* Case No. 08-CV-00396-WHP, a case involving the interpretation of an agreement regarding the sale of sound recordings.

12.   In 2015, on behalf of the recording artist known as Jay-Z, I provided expert witness testimony on the language and purpose of several music license agreements in light of music industry practices. *See, Fahmy v. Jay-Z (aka, Shawn Carter), et. al.,* Case No. 2:07-cv-05715-CAS (April 28, 2015).

13.   In 2016, on behalf of Universal Music Group, I provided an expert witness report on the interpretation of the royalty provisions of an artist's recording agreement. *Beckett v. Universal International Music B.V.,* Case No. CV 15-02153 (2016).

14.   In 2017, on behalf of recording artist Katy Perry, I provided a federal court with an expert report on industry customs and practices concerning the scope of live concert public performances licenses granted by ASCAP. See*, Marcus Gray v. Katy Perry,* Case No. 2:15-cv-05642-CAS-JC Civil Minutes—General, Dkt# 246 (Apr. 3, 2017).

15.   In 2018, I testified as an expert on the interpretation of the terms of an exclusive recording agreement between Universal Music Group and the recording artist known as "50 Cent," as well as industry practices concerning the use of the name, voice and likeness of a recording artist in connection with the marketing and distribution of sound recordings of other recording artists. *Curtis James Jackson, III (p/k/a/ 50 CENT) v. William Leonard Roberts, II (p/k/a/ RICK ROSS),* Case No. 3:17-cv-00550-WWE. (D. Conn.).

16.   Earlier this year, I submitted an expert report, a rebuttal expert report, and an affidavit for several music publishers, including the songwriter/owners of the musical works performed by Frankie Valli and the *Four Seasons* (e.g., *Big Girls Don't Cry*, *Walk Like a Man*, *Sherry*, etc.), regarding  industry customs and practices concerning the licensing of musical works for use on digital music service providers.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

*Robert Gaudio d/b/a Seasons Four Music, et. al. v. Spotify USA, Inc.*, Case No. 3:17-cv-01616, District Judge Jon Philips McCalla (Mid. Dist. Tenn., 2018).

17.   Earlier this year, I was retained by the record company Universal Music Group in a case regarding the interpretation of various provisions of a record producer's recording agreement. *Overrated Productions, Inc. v. UMG Recordings, Inc.*, Case. No. 2:2019cv02899-RSWL (C. Distr. CA, Apr. 15, 2019).

18.   I am the co-inventor of the patent for a means of tracking revenues and producing royalty statements arising from the exploitation of musical works and sound recordings. *Web-based Royalty System and User Interface*, Patent No. US 8,712825 (April 29, 2014).

## II.  Expert Assignment

19.   My assignment in this matter was to help supplement the record with music industry customs and practices concerning the licensing of musical works and sound recordings for reproduction, distribution, and public performance in connection with in-flight listening by passengers traveling on commercial airlines. Specifically, I've been asked to opine on at least the following:

- The kinds of music services offered by the Defendants
- The kinds of licenses required by Defendants to operate its music services
- Music industry customs and practices in procuring the licenses required to operate such services
- Whether the policies and practices chosen by Defendants to procure the required reproduction licenses conformed to industry practices and the law

20.   To that end, I prepared and submitted in this matter an expert report dated May 7, 2019 ("Kohn Report") and a rebuttal expert report dated May 21, 2019 ("Kohn Rebuttal Report").  A true and exact copy of the Kohn Report is attached hereto as **Exhibit 1** and a true and correct copy of the Kohn Rebuttal Report is attached hereto as **Exhibit 2**. In addition, I was asked to assess and respond to defendants' expert reports of Mr. Jeremy Smith submitted on May 7, 2019 ("Smith Report") attached as

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

Exhibit 50 to the Declaration of Lauren Greene ("Greene Decl.") and of Mr. Paul Leo Carl Torremans submitted on May 21, 2019 ("Torremans Report") Greene Decl. Exhibit 42.

21.    In preparing my reports, I relied on music industry standards concerning the licensing of musical works and sound recordings, as well as my education, training, and personal experience in representing music publishers, record companies, TV & film producers and studios and others, as well as in founding and operating a music service provider.

### III.    Summary of Expert Opinions

22.    In the sections below, I summarize the kinds of licenses that an in-flight music service provider would require with respect to sound recordings and musical works to engage in its commercial activities.

23.    Owing to the *divisibility of copyright,* an in-flight music service provider will require not only a reproduction license (e.g., server copy license) under the copyright owner's exclusive right of reproduction (§106(1)) and a public performance license under the copyright owner's exclusive right of public performance (§106(4) or (6)), but also a distribution license under the copyright owner's exclusive right of distribution (§106(3)). Importing copies or phonorecords into the United States without authorization of the copyright owner, even where such copies or phonorecords were lawfully reproduced overseas, is an infringement of the copyright owner's exclusive right of distribution, actionable under Section 501. 17 U.S.C. §602(a)(1) and (2). Each of these acts (e.g., reproduction, public performance, importation or distribution) requires a separate license, which may be administered directly by the copyright owner or by various agents under its authority, and the fact that a licensee is licensed to do one of these acts does not automatically mean the licensee is authorized to do another.

24.    Thus, for example, a license to publicly perform musical works does not include a include a license to either reproduce or distribute the works, nor does it

-6-

include a license to do anything with respect to the sound recordings embodying such musical works. Indeed, public performances licenses will typically expressly state that no reproduction or distribution license is included with the public performance license. ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ IFP has not produced any license that would authorize it to import into the United States any of BMG's works at issue in this matter. Greene Decl. Ex. 2 at 190-91.

25.    The record in this matter is replete with evidence showing that IFP knowingly infringed copyrighted musical works and sound recordings over a period of years by reproducing, publicly performing, distributing, or importing such works and that a trier of fact could reasonably determine that IFP consciously and repeatedly made business decisions to continue its unauthorized use of such works. IFP, in my view, could not demonstrate to a trier of fact that it believed its use of BMG's works were authorized. On the contrary, the record demonstrates IFP knew it was were operating without the required licenses. Meanwhile, the unauthorized use of BMG's works helped IFP generate revenues from the airlines. Under these circumstances, a trier of act could certainly find IFP's infringement was willful.

## IV.  The Facts Considered, The Opinions Expressed Herein, and the Basis and Reasons for them

### A.    Facts Considered

26.    Plaintiff BMG Rights Management (US), LLC (hereinafter "BMG") is a record company and music publishing company that owns or controls the rights to thousands of sound recordings and musical works. It holds copyrights in and to the sound recordings and musical works listed in the exhibits to the Complaint in this matter and produced during discovery.

27.    It is my understanding that Defendants Global Eagle Entertainment, Inc. and Inflight Productions Ltd Limited Company (collectively, "IFP") create and offer programs of musical works and sound recordings for in-flight listening by passengers

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

traveling on commercial airlines. It is my understanding that IFP creates both (a) radio-like programs (e.g., including channels that contain playlists of discrete genres of music) accessible by passengers through airplane armrests, and  (b) audio-on-demand programs that offer passengers a form of interactivity (e.g., the ability to pause, fast forward, rewind, rearrange, and otherwise manipulate music tracks) using seatback touchscreen panels. IFP's radio-like programing may also include providing pre-programmed background for performance on aircraft during passenger boarding and prior to take-off, and after landing and during disembarkation. IFP may also reproduce and publicly display images or artwork associated with the recording artists of the recordings being made available as part of the service. See, *UMG Recordings v. Global Eagle*, No. 13-cv-3466 (C.D. Cal., Mar. 31, 2016, adopted as final ruling on Apr. 20, 2016). Though the sound recordings in the UMG matter are not likely to be the same as any of those in the present matter, some of the sound recordings at issue in the UMG matter may embody one or more of the musical works at issue in the present matter.

28.    I understand that IFP acquired the musical recordings for these uses in either physical CD or digital permanent download form and copied each track to a computer hard drive. *Id*.

-8-

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

29.     I understand that IFP is not alleged in this matter to have engaged in the reproduction or public performance of *audiovisual works* containing BMG's copyrighted musical works or sound recordings, but should I learn it had done so, I reserve the right to supplement the opinions below.

30.     I also considered the facts or data set forth in the Kohn Expert Report, the Kohn Rebuttal Report, and set forth below, and any exhibits attached hereto.  I also reviewed and considered every license produced by Defendants in this case.

## B.     Licenses Under Copyright Required by IFP

31.     A provider of an in-flight music service will require licenses from those who control the copyrights in the *sound recordings*[2] to be offered by the service and any *musical works*[3] embodied in those recordings.  A license to reproduce and publicly display any copyrighted images or artwork ("Cover Art") associated with such recordings will also be required.

32.     Owing to the *divisibility of copyright,* an in-flight music service provider will require various forms of licenses to exercise one or more of a copyrighted owners exclusive rights under copyright, often divided up and licensed separately to achieve the public purposes for which copyright has been recognized. To that end, Section 106

[2] A *sound recording* is a work that results "from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. §101. Thus, a *sound recording* is an audio-only work and one that is that is separate from any musical or literary work that may be embodied in it. A sound recording may be distributed by means of *phonorecords* (defined below), digitally transmitted by means of *digital phonorecord deliveries* (defined below) and other forms of digital audio transmissions, or otherwise transmitted, as by terrestrial analog broadcast.

[3] The term *musical work* is not defined by the Copyright Act, but is generally understood to mean a song (i.e., a short poem or set of words set to music) or an instrumental composition containing one or more organizational elements, such as melody, chord progression, and rhythm or beat. In the music industry, the terms musical work, musical composition, and song are often used synonymously. A sound recording embodying a musical work is considered a derivative work of such musical work. Musical works may be reproduced in copies or phonorecords.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

of the Copyright Act gives the copyright owners several exclusive rights, including the exclusive right to *reproduce* the work in *copies*[4] and *phonorecords*[5] (17 U.S.C. §106(1)), to prepare *derivative works* (§106(2)), to *distribute* the work in copies or phonorecords (§106(3)), to *perform* the work *publicly* (§106(4), and to *display* the work publicly (§106(4)). In the case of sound recordings, in the United States a copyright owner's exclusive right to perform the recording publicly is limited to public performances that are *by means of a digital audio transmission*. (§106(6)).

33.    In addition, a copyright owner has the exclusive right to *import* copies and phonorecords of its copyrighted works into the United States. 17 U.S.C. §602(a)(1) and (2). The importation of such a work into the United States, whether lawfully or unlawfully reproduced or acquired outside of the United States, is an infringement of the copyright owners' exclusive right to distribute copies or phonorecords under Section 106, actionable under Section 501. *Id.*

34.    Due to this divisibility of copyright, each of these acts may require a separate license, which may be administered directly by the copyright owner or by

---

[4] The term *copies* means "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term 'copies' includes the material object, other than a phonorecord, in which the work is first fixed." 17 U.S.C. §101.

[5] The term *phonorecords* means "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term phonorecord includes the material object in which the sounds are first fixed. 17 U.S.C. §101.

Thus, material objects—*e.g.*, vinyl album, tape, compact disk, hard disk, flash memory—in which musical works may be reproduced, as embodied in a sound recording, are *phonorecords*. All other material objects in which musical works may be reproduced, other than as embodied in a sound recording—*e.g.*, printed paper, audiovisual works recorded on laser disks, hard disks, or flash memory—are *copies*.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

various agents under its authority, and the fact that a licensee is licensed to do one of these acts does not automatically mean the licensee is authorized to do another.

## 1.   Musical Work Licenses

35.   Musical works are protectable as copyrighted works of authorship under the Copyright Act. 17 U.S.C §102(a)(2). With respect to musical works, in-flight music services will require three basic forms of licenses: (a) a license to reproduce copies to facilitate the public performance of the musical works (i.e., *server copy license*) to the passengers on a commercial aircraft, (b) a license to distribute or import copies or phonorecords of the musical work for such purpose, and (c) a license to perform the works publicly (i.e., *public performance license*) for such purpose.[6] The first is a license required under the authority of the copyright owner's exclusive right to reproduce the work in copies and phonorecords (17 U.S.C. §106(1)). The second is required under the authority of the copyright owner's exclusive right to distribute copies or phonorecords of the work (§106(3)) or import copies or phonorecords thereof (§602(a)(1)). The third is required under the copyright owner's exclusive right of public performance (§106(5)) or, in the case of sound recordings, right of public performance by means of digital audio transmission (§106(6)).

### a.   Server Copy Licenses

36.   It is undisputed that IFP reproduces BMG's copyrighted musical works in the course of making server copies used to facilitate public performances on aircraft. A *server copy* (or more appropriately, *server phonorecord*) of a sound recording embodying a musical work is a phonorecord that is made, not for distribution for private use, but for some other purpose, such as to facilitate a public performance, broadcast, or digital transmission, such as an interactive stream, limited download, or permanent download. (Traditionally, copies reproduced not for

---

[6] What licenses are required for in-flight use of music on commercial airliners has been no secret. A section entitled "Transcriptions for In-Flight Use on Airlines" has been included in every edition of *Kohn On Music Licensing* since the book was first published in 1992. See, A. Kohn & B. Kohn, *The Art of Music Licensing*, Chapter 8 on Electrical Transcription Licenses at 344 (Prentice-Hall Law & Business, 1992).

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

distribution to the public for private use, but to facilitate a broadcast or other transmission, were called *electrical transcriptions*. With advent of digital reproduction, where copies of musical works began to be reproduced on "computer servers," these copies are now generally known as "*server copies*").[7] Because IFP reproduces server copies for the commercial purpose of facilitating public performances, IFP requires a *server copy license*.[8]

37. *Section 115 Compulsory License Provision Not Applicable*. While the Copyright Act provides a copyright owner with various exclusive rights under copyright (e.g., reproduction, distribution, public performance), the Copyright Act uses the principle of divisibility to recognize certain other distinctions important to further the purpose served by the copyright interest. For example, the compulsory license provision under Section 115 of the Act implicitly draws a distinction between phonorecords made and distributed *to the public for private use* and those made for other purposes, such as *the commercial purpose of facilitating an analog broadcast or digital audio transmission*. Because IFP does not appear to be reproducing copies of BMG's musical works for the purpose of distributing those copies to the public for private use, Section 115's compulsory license provision does not apply. This means

---

[7] See, generally, *Kohn On Music Licensing*, 5th Ed., Chapter 14 on "Licensing Music in Background Music Services, Digital Jukeboxes, and Other Commercial Reproductions (Electrical Transcription Licenses)" at 989-1009 (Wolters Kluwer, 2019). In the music industry, the terms electrical transcription, server copy, ephemeral recording, source file, and/or recording "master" or "stamper," are various terms used to describe a phonorecord used to facilitate either the duplication and distribution or digital delivery of musical works to the public for private use or to facilitate the public performance, broadcast, or digital transmission thereof. The kinds of phonorecords in which server copies are embodied are typically computer hard disks or other form of permanent computer memory that operate as "servers," or devices that facilitate the serving or transmission of data, such as data that comprises the digital representation of a sound recording.

[8] The term *server copy license*, a form of electrical transcription license, permits another, under the authority of a copyright owner of a musical work, to reproduce a sound recording embodying the musical work in a phonorecord that is not for distribution or digital delivery to the public for private use, but is for some other commercial purpose, such as to facilitate a performance, broadcast, digital delivery, or other kind of transmission. Id.

-12-

that BMG could at no time be compelled to grant reproduction licenses for IFP's acts of reproduction.

38.    *Server Copy Licensing is Well Established by Case Law*. The need to secure a server copy license to make reproductions that facilitate a public performance has been well established by case law. In *Rodgers & Hammerstein Org. v. UMG Recordings, Inc.*, 60 U.S.P.Q.2d (BNA) 1354, No. 00-Civ-9322 (JSM) (S.D.N.Y., 2001), the court held that server copies of sound recordings of musical works reproduced without authorization for purposes of facilitating interactive streaming constituted an infringement of the copyrights in the *musical works* embodied in those recordings. Similarly, in *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000), the court held that the unauthorized reproduction by MP3.com of hundreds of thousands of server copies of sound recordings, embodying as many copyrighted musical works, for the purpose of facilitating interactive streams without authorization of the owners of the sound recording copyrights, constituted an infringement of those copyrights, and were not a fair use thereof.

39.    *Public Performances Licenses Do Not Authorize the Reproduction of the Musical Works in Server Copies*. Even if IFP secured a license to *perform publicly* the BMG's musical works in connection with its service, such as from ASCAP or BMI, it would still require a separate server copy license to authorize its *reproductions* of BMG's copyrighted musical works. In accordance with music industry custom and practice, the agreements under which IFP would procure public performance licenses will typically be limited to the exercise of the copyright owner's exclusive right of public performance under Section 106(d) of the Copyright Act. The agreement will *not include* a license to reproduce copies or phonorecords of the musical work *for any purpose*.

40.    Indeed, such agreements typically make it abundantly clear that only a license for the public performance, not for reproduction, is granted. For example, the public performance license IFP procured ███████████████████████████,

-13-

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

41.    Similarly, the public performance license █████████████

**b.  Distribution or Importation Licenses**

42.    As noted, the Copyright Act provides an owner of a musical work the exclusive right to *distribute* copies or phonorecords of the work (17 U.S.C. §106(3)) or *import* copies or phonorecords of the work (§602(a)(1)). To do either act, one would require a license from the copyright owner. The Copyright Act provides for an exception where the importation is for the "private use" of the importer or is "by any person arriving from outside of the United States or departing from the United States with respect to copies or phonorecords forming part of such person's personal baggage." 17 U.S.C. §602(3)(B).

43.    It is clear, however, that IFP's use does not fall within such exception. The phonorecords were being used for the *commercial use* of facilitating its business of providing in-flight entertainment for passengers on commercial aircraft entering and leaving the United States. To that end, it was importing copies or phonorecords of copyrighted musical works and sound recordings into the U.S. and exporting them to locations outside of the United States and, it appears IFP has been engaging in such activity without authorization from such copyright owners.

-14-

### c. Public Performance Licenses

44.     To offer performances of copyrighted musical works on commercial aircraft for listening by passengers, IFP requires a public performance license (under the authority of the music copyright owner's exclusive right to perform the work publicly). This is because the service facilitates the rendering or playing[9] of the musical works while the transmission or stream of its recording is being communicated or delivered *to the public* by the means of a device or process.

45.     "To perform . . . a work *publicly* means (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate a performance…of the work…to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. §101.

46.     When an airline or inflight music service performs a musical work by broadcast over its loudspeaker system or in-seat speakers, it is doing so "at a place . . . where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." Where the musical work is transmitted on an interactive or partially interactive basis, such as to a seatback touchscreen panel, it is being to transmitted or otherwise communicated "to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." Either way, the performances of these musical works aboard a commercial aircraft are being made *publicly*.

47.     Licenses to so publicly perform such musical works would be required from each public performance organization ("PRO") whose repertory was implicated

---

[9] "To *perform* a work means to recite, render, play, dance, or act it, either directly or by means of any device or process. . . ." 17 U.S.C. §101.

by the performances facilitated by IFP (e.g., ASCAP, BMI, SESAC, GMR) or directly from the respective music copyright owners.

48. Because the actions of both the commercial airline company (e.g., United Airlines, American Airlines) and an in-flight music service company (e.g. IFP) are involved in the process of effecting public performances of musical works, it is the custom and practice of public performance rights organizations ("PROs") to license one or the other. See, *Marcus Gray v. Katy Perry,* Case No. 2:15-cv-05642-CAS-JC Civil Minutes—General, Dkt# 246 at 14 (Apr. 3, 2017) (holding that a public performance license covers every person responsible for, or who otherwise contributes to, publicly performing the works). Thus, if an in-flight music service is providing audio content to an airline for its fleet of aircraft, then that service may license public performances for that fleet. If an airline prefers to hold the performance licenses, then the airline may license public performances directly from the PROs. For example, BMI offers two performances licenses for these purposes: (a) for music services, the BMI Aircraft Music Service Agreement and (b) for airlines, the BMI Aircraft Agreement.

49. If the airline chose to procure its own public performance licenses, then the in-flight music service provider would only require a server copy license, which license would customarily include an express license to distribute or import the copies reproduced under the license, but such distribution or importation could lawfully occur only within the territory authorized by the license. For example, IFP's application for a ██████████████████████████████████ ██████████████████████████████████████████ purportedly provided IFP with a license to reproduce and distribute phonorecords of musical works in ████████ ██████████, but such license was limited to the countries of ████████████████. Accordingly, under such license, while any phonorecords lawfully reproduced in ████████████████████████████████████████████████ ████████████████████████████████████████████████

-16-

the importation of such phonorecords into the *United States* without a valid import license would constitute infringement of the U.S. copyrights in such works. If the airline chose not to obtain the public performance license, the in-flight music service provider would need to procure both the server copy license, together with any associated distribution, exportation or importation licenses, and the public performance licenses, required for each applicable territory.

50.     An airline may prefer to have the in-flight music provider procure the appropriate public performance licenses as part of the service it is providing to the airline. ████████████████████████████████████████████████

51.     Even if IFP had procured a public performance license for the performances of musical works provided to passengers, a license to reproduce copies and phonorecords of the musical works, and to distribute or import them, would still be required. As noted above, public performance licenses do not include reproduction or distribution licenses.  Indeed, they will often expressly state that no reproduction or distribution license is included with the public performance license.  ████████████ ████████████████

### d. Typical Terms of In-Flight Licenses for Musical Works

52.     Licenses required for in-flight use of musical works in the United States are customarily licensed by two different types of sources: (a) the music publisher for the reproduction (i.e., *server copy*) and/or distribution/importation licenses and (b) the PROs for the public performance licenses.

53. *Reproduction and Distribution/Importation License*. For the reproduction (i.e., *server copy*) and/or distribution/importation licenses, music publishers, or agents and administrators acting on their behalf, will customarily seek between 12-15% of the in-flight music service providers gross revenue, subject to monthly minimum fees based on the number of aircraft licensed and the type of service offering (e.g., (i) audio-only content, (ii) audiovisual content, (iii) boarding and disembarking use only). The license would have a term of two or three years with automatic renewal subject to termination by the publisher some time (e.g., 60 days) prior to the expiration of a renewal period. The territory of license may be limited to the United States and its territories, though major music publishers may offer a worldwide license.

54. *Public Performance License*. For public performance licenses, the terms may vary from PRO to PRO, but a PRO will typically charge a fee per aircraft covered by the license. Again, the fee may vary depending upon the type of offering: (i) audio only content, (ii) audiovisual content, (iii) boarding and disembarking use only. Audio-only programing may range from $30 to $85 per aircraft, depending on the number of seats on the aircraft (e.g., 100 or less, 101-200, 201-300, 300+). Where the musical works are embodied in audiovisual works, the fee may range between $4 to $12 per aircraft. Where audio-only programming is offered only during boarding and disembarking, the fee may vary from $7 to $23 per aircraft, depending upon the number of seats on the aircraft. The PRO requires periodic reports from the in-flight music service provider or airline, as the case may be, including information necessary to accurately calculate the fee. The license would be limited to the United States and its territories. A public performance license would be required from the respective PRO in each territory in which aircraft would arrive or depart with passengers. The license would typically have a term of two or three years, renewable for one-year periods unless cancelled by either party not less than 60 days prior to the end of any contract year.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

55.    *Sound Recording License Not Included.* Neither a license to reproduce and distribute a musical work, nor a license to publicly perform a musical work, will normally authorize the reproduction, distribution, importation or public performance of any *sound recording* that may embody the musical work.

**2.    Sound Recording Licenses**

56.    Sound recordings fixed on or after February 15, 1972 may be protected as a copyrighted work of authorship under the Copyright Act. 17 U.S.C §102(a)(7). Sound recordings fixed prior to February 15, 1972 ("Pre-'72 recordings") are protectable under state law. See, *A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 560-61 (1977); *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 725 (9th Cir. 1984).

57.    With respect to sound recordings, an in-flight music service provider will require at least three forms of licenses: (a) a license to reproduce copies to facilitate the public performance of the musical works (i.e., *master use* license), (b) a license to distribute or import copies or phonorecords of the sound recording for such purpose, and (c) a license to publicly perform the sound recording to the extent the copyright owner has the exclusive right of public performance (i.e., in U.S., *public performance by means of digital audio transmission* license). The provider may also require a license to reproduce and display Cover Art relating to the recordings reproduced and performed by the service.

### a.    Master Use Licenses

58.    It is undisputed that IFP reproduces BMG's copyrighted sound recordings in the course of making server copies used to facilitate public performances of those recordings on commercial aircraft. The commercial reproduction of sound recordings is typically authorized in what is customarily known as a *master use license*.

59.    Because IFP reproduces copies of BMG's recordings for the commercial purpose of facilitating public performances, IFP requires a *master use license* under

-19-

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

the authority of the BMG's exclusive right to reproduce the work in phonorecords. See, *UMG Recordings, Inc. v. MP3.com, Inc.,* 92 F. Supp. 2d 349 (S.D.N.Y. 2000) (*held*, the unauthorized reproduction by MP3.com of hundreds of thousands of server copies of sound recordings for the purpose of facilitating interactive streams without authorization of the owners of the sound recording copyrights, constitute an infringement of those copyrights).

60.     Master use licenses would be procured directly from the owners of the sound recordings, typically a record company. Like server copy licenses for musical works, these master use licenses are not subject to any compulsory license provisions.

### b. Distribution or Importation Licenses

61.     As noted, the Copyright Act provides an owner of a sound recording the exclusive right to **distribute** copies or phonorecords of the recording (17 U.S.C. §106(3)) or **import** copies or phonorecords of the recording (§602(a)(1)). (As noted, similar rights are afforded under state law to owners of Pre-'72 sound recordings). To do either act, one would require a license from the copyright owner of the sound recording. ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████ It appears that it has been engaging in such activity without authorization from BMG.

### c. Public Performance Licenses

62.     In the United States, the exclusive rights of a copyright owner to authorize the public performance of a sound recording is limited to performing the recording publicly *by means of a digital audio transmission*. 17 U.S.C. §106(6). Thus, if the public performance is transmitted by *analog* means, the transmitter does not require a license from the owner of the sound recording for the performance. In addition, Section 114 of the Copyright Act provides for certain exemptions from Section 106(6), one of which is an exemption for non-interactive digital audio

-20-

"transmissions within a business establishment, confined to its premises or immediately surrounding vicinity." 17 U.S.C. 114(1)(C)(iii). Owners of Pre-'72 sound recordings have similar rights under state law, except insofar as such rights may be exercised under the terms of the Music Modernization Act of 2018 as of the October 11, 2018 effective date of such Act.

63.   Accordingly, to the extent the audio-only transmissions within an aircraft are either *analog* transmissions or *non-interactive* digital transmissions confined to the interior of the aircraft, no public performance license would be required for such transmissions of sound recordings. Otherwise, a license to perform the sound recordings publicly would be required. To the extent an interactive transmission complies with Section 114's statutory compulsory license provisions, the transmitter may compel the sound recording owner to grant a statutory license under the terms established by regulation. Such compliant transmissions are customarily administered in the U.S. by SoundExchange. A licensee, however, may negotiate greater flexibility in the frequency or interactivity of content offered by procuring such a license directly from the applicable record companies.

64.   It is my understanding that IFP offers two kinds of audio-only programs for in-flight listening on commercial airlines: (a) radio-like programs (e.g., including channels that contain playlists of discrete genres of music) accessible by passengers through airplane armrests or used as background music for boarding and landing, and (b) audio-on-demand programs that offer passengers a form of interactivity (e.g., the ability to pause, fast forward, rewind, rearrange, and otherwise manipulate music tracks) using seatback touchscreen panels.

65.   With respect to the audio-only, radio-like programs, whether transmitted on an analog or non-interactive digital basis (e.g., through on-board loudspeakers or passenger seat armrests), no public performance license would be required for the performances of the sound recordings. Otherwise, licenses would be required from the sound recording owners or their representatives. As noted, with respect to audio-

on demand programs, the music service provider would require a public performance license, either a statutory license administered by SoundExchange or negotiated license administered by the applicable record companies.

66.   Even if IFP were not required to procure a public performance license for the performances of sound recordings provided to passengers, a license to reproduce copies and phonorecords of the sound recordings, and to distribute or import them, would still be required for each territory in which such activities occur.

### d.  Typical Terms of In-Flight Licenses for Sound Recordings

67.   Unlike in-flight licenses for musical works, which are customarily licensed by two sources, a music publisher for the reproduction license and a PRO for the public performance license, licenses for the sound recordings are customarily provided by one source, the record company or other owner of the sound recordings. The record company would typically provide all the licenses an in-flight music service would require from the record company with respect to its use of its sound recordings. This would include the master use license, distribution and important license, and, to the extent required, the public performance license, for each recording. The agreement would also customarily include a license to use the Cover Art associated with the sound recordings licensed, but they would not include a license to any *musical works* underlying such recordings.

68.   Record companies would customarily demand an advance against monthly fees that will depend upon the seating capacity of the aircraft, number of aircraft, and the scope of the use (e.g., audio-only or audiovisual programmed channels, background music for boarding and landing, the scope of interactivity permitted), and the audio content selected for use, among other factors. The term of agreements ranged from 18 months to two years, renewable but subject to cancelation by the record company upon several months' notice before the end of each renewal period. They are typically made on a worldwide basis.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

69.    For example, ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████

**3.    Cover Art Licenses**

70.    To the extent the music service provider desires to reproduce Cover Art with the marketing or presentation of the sound recordings to passengers, the music service provider will require a license to reproduce, publicly display, and distribute (and import and export) such Cover Art. 17 U.S.C. §106(1), (3), (5); §602(a)(1). The sound recording copyright owner typically owns or controls the administration of the Cover Art and would customarily license the right to reproduce, distribute, and publicly display Cover Art as part of a license to reproduce the sound recordings to which the art is associated. To the extent IFP used Cover Art without authorization from the copyright owners, they could be held to have infringed each of the copyrights in such Cover Art (in addition to each sound recording and musical work).

**C.    IFP's Overseas Licenses Are Not Applicable in the U.S.**

71.    It is the custom and practice of the music industry that the rights societies, such as PROs and other licensing and collection agencies, limit the applicability of the licenses they grant to the territory or territories in which they are authorized by the copyright owners to operate.

72.    To the extent IFP contends that they had the right to reproduce, distribute, and/or publicly perform musical works and sound recordings by virtue of licenses they

-23-

may have received from organizations operating outside of the U.S., ███████

████████████████████ that contention would be misplaced.

Licenses issued by such organizations are limited by practice to the reproduction, distribution, and/or public performance solely in specified territories outside the United States. █████████████████████████████████

████████████████████████████████████

██████████████████████████

73.      Accordingly, any public performances of the musical works in the United States would not be covered by any public performance license issued to IFP for public performance outside the United States, such as in the European Economic Area.

74.      Likewise, any reproductions lawfully made outside of the United States by license from overseas organizations could not be distributed within, or imported into, the United States without the authority of the owner of copyright. See, 17 U.S.C. §106(3); §602(a)(1).

**D.      Trier of Fact Could Find Infringement Was Willful**

75.      Where a court finds that an infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000" for all infringements of any one work.   See 17 U.S.C. § 504(c)(1)-(2).  Enhanced statutory damages for willfulness are intended to "'sanction and vindicate the statutory policy' of discouraging [copyright] infringement," *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1337 (9th Cir. 1990) (quoting *F.W. Woolworth Co. v. Contemporary Arts*, Inc., 344 U.S. 228, 233 (1952)), and "may be necessary in a particular case to prove that it 'costs less to obey the copyright laws than to violate them,'" *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 514 (7th Cir. 1994) (citation omitted).

76.      A plaintiff sustains its burden of proving willfulness "by showing [the] defendant knew or should have known it infringed [the plaintiff's] copyrights. . . . Willful does not mean malicious, rather, it means with knowledge, whether actual or

-24-

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

constructive." *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*, 446 F.Supp.2d 1164, 1173 (E.D. Cal. 2006) (quoting *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F.Supp. 1522, 1543 (S.D.N.Y. 1991)); accord *Peer Int'l*, 909 F.2d at 1335. "Alternatively, willfulness is shown where 'the defendant recklessly disregarded the possibility that its conduct represented infringement.'" Id. (citing *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001); *Sega Enters. Ltd. v. MAPHIA*, 948 F.Supp. 923, 936 (N.D.Cal. 1996)).

77.     Although the determination of willfulness generally requires an assessment of a party's state of mind and is ordinarily a question of fact reserved for the jury, "where the relevant facts are admitted or otherwise undisputed, willfulness can be appropriately resolved on summary judgment." See id. (citing, among others, *Peer Int'l*, 909 F.2d at 1335-36; *Sega Enters.*, 948 F.Supp. at 936).

78.     The record is replete with evidence showing that IFP knowingly infringed BMG's copyrighted musical works and sound recordings over a period of years and that IFP consciously and repeatedly made business decisions to continue its unauthorized use of BMG's works.

79.     In March, 2008, IFP hired the U.K.-based intellectual property consultant Mark Isherwood to assess the legality of IFP's use of copyrighted music around the world, including the U.S. ███████████████████████████████

80.     By email dated April 23, 2009, Mr. Isherwood wrote to Mr. Taverner and Mr. Borgeson, "From an IFP perspective no licences are in place in the US that we have been able to identify." Greene Decl., Ex. 9 at GEE0006348. Mr. Borgeson responded, "Thank you for your response. We understand there are several 'gray' areas with U.S. licensing." *Id*. at GEE0006347. Mr. Borgeson then asked whether Mr.

-25-

1    Isherwood would be opposed to forwarding his email to Mr. Borgeson's contact at

2    United Airlines. Id. Mr. Taverner, in an obvious attempt to obstruct the dissemination

3    of the information regarding IFP's lack of licenses in the U.S., replied to Mr.

4    Borgeson, "If Mark is ok about you forwarding it you should remove the bit about our

5    license." *Id.*

6         81.   ██████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████   ████████████████████████████

9    ████████████████████████████████████████████████  █

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████   Nevertheless, IFP continued to

13   reproduce, distribute, import, and perform BMG's musical works and sound

14   recordings in the U.S. without authorization.

15        82.   Indeed, on May 20, 2009, Mr. Borgeson specifically asked Mr. Taverner,

16   in light of the lack of licenses and the time Mr. Isherwood suggested it might take to

17   secure them, "what direction would you like us to pursue in regards to new and

18   existing business? Should we continue 'as is' for now. . . it would be great to get a

19   more clearer understanding of your position on the matter." On May 22, 2009, Mr.

20   Borgeson got his answer from Gerard Shadrick of IFP: "[F]or now (right or wrong)

21   we are maintaining the current status quo." Greene Decl., Ex. 15 at GEE0006247.

22   Indeed, IFP continued to exploit BMG's musical works and sound recordings in the

23   U.S. without authorization.

24        83.   By May 2012, IFP still did not have in place the licenses they required to

25   operate in the U.S. ██████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████████████   Yet, IFP continued to reproduce,

-26-

distribute, import, and perform BMG's musical works and sound recordings in the U.S. without authorization. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ These decisions were made at the at the highest levels of its international management.

84.    To refute evidence of willful infringement, a defendant must establish a good faith belief in the innocence of its conduct. *Peer Int'l*, 909 F.2d at 1336. IFP, in my view, could not demonstrate to a trier of fact that it believed its use of BMG's works were authorized. The record clearly demonstrates they knew they were operating without the required licenses. Meanwhile, the unauthorized use of BMG's works were helping IFP generate revenues from the airlines. Under these circumstances, a trier of act could certainly find IFP's infringement was willful. And, since the facts relevant to willfulness were admitted by IFP, or are otherwise undisputed, willfulness can be appropriately resolved on summary judgment. *Peer Int'l*, 909 F.2d at 1335-36; *Sega Enters.*, 948 F.Supp. at 936.

**IV.  Response to Mr. Smith's Report**

85.    Nothing in the Smith Report has prompted me to change any of the opinions I submitted in the Kohn Report dated May 7, 2019 ("Kohn Report"). I respond to several of Mr. Smith's salient opinions as follows.

**A.    IFP Could Not Have Reasonably Relied on License Agreements from Rights Organizations Outside of the United States to Permit IFP to Reproduce, Distribute or Publicly Perform BMG's Copyrighted Works Inside the U.S.**

86.    Mr. Smith opines that:

- ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

-27-



87.     Mr. Smith's opinion fails because (a) the clear and unambiguous language of each of the licenses upon which IFP purports to rely expressly preclude the use of BMG's copyrighted works in any manner outside the scope of such licenses, (b) each of such licenses follow well established and well known music industry customs and practices with respect to their limited scope and terms, and (c) IFP appears to have been well aware of those customs and practices and, to the extent it wasn't, it should have been, given that a fundamental aspect of its business, and significant benefit offered to its clients, is the clearance of the required licenses for inflight use of musical works and sound recordings.

88.     The foreign licenses that Mr. Smith cites that purportedly permit the *public performance* of BMG's copyrighted works (i) do not, in fact, permit IFP to publicly perform such works outside the territory covered by such licenses and (ii) do not, in fact, permit IFP to *reproduce* or *distribute* such works anywhere in the world. By the same token, the foreign licenses that Mr. Smith cites that purportedly permit the *reproduction and distribution* of BMG's copyrighted works (i) do not, in fact, permit IFP to reproduce or distribute such works outside the territory covered by such

licenses and (ii) do not, in fact, permit IFP to *publicly perform* such works anywhere in the world.

89.   Moreover, any foreign licenses that Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's *musical works* do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *sound recordings* anywhere in the world. By the same token, any foreign licenses that Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's *sound recordings* do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *musical works* anywhere in the world.

90.   Finally, any foreign licenses that Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's copyrighted works outside of the United States do not, in fact, include a license to *import* any such works into the United States.

91.   The limited scope and restrictions set forth in the foreign agreements cited by Mr. Smith follow well-known industry customs and practices. For example, a licensed granted by a performance rights organization ("PRO") to publicly perform a musical work will customarily *not* include a license to reproduce or distribute the work. By the same token, a licensed granted by a mechanical rights collection society to reproduce and distribute a musical work will customarily *not* include a license to publicly perform the work. A license to perform a musical work inside of the licensed territory does customarily *not* permit the performance of the work outside of the licensed territory. And, a license to reproduce, distribute, and/or publicly perform a sound recording will customarily *not* include a license to reproduce, distribute, and/or publicly perform any musical work or works that may be embodied in that sound recording.[10]

---

[10] Production music libraries, which often control the rights to both the sound recordings and the musical works embodied in those recordings, may grant a license for the use of both the recording

92.     Indeed, these well-established customs and practices were spelled out in lay terms in a brochure produced by IFP in this case entitled ███████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████

93.     Mr. Smith does not point to any evidence that IFP did, in fact, rely on its foreign agreements to reproduce, distribute, or publicly perform BMG's copyrighted works. And, for the reasons set forth herein, any such reliance would not have been reasonable.

---

and the musical work, but the works in this case, and the works generally used for inflight music, are of popular songs and recording artists, not production or "background" music. In some countries, especially those comprising smaller, specialized music markets, such as in the Middle East, the functions of a record company and music publisher are often combined. ██████████████
███████████████████████████████████████
███████████

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

1. **The foreign agreements Mr. Smith cites that purportedly permit the public performance of BMG's copyrighted works (i) do not permit IFP to publicly perform such works outside the territory covered by such licenses and (ii) do not permit IFP to reproduce or distribute such works anywhere in the world.**

94.    None of the agreements between IFP and *performance rights organizations (PROs)* outside of the United States permit the *reproduction or distribution* BMG's musical works in (or import into) the United States. Nor could anyone entering into such an agreement have reasonably believed so.

95.    For example, Mr. Smith ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

96.    Moreover, it would be unreasonable for any such licensee to reasonably believe it was authorized by ██████ to *publicly perform* any of the musical works otherwise licensed under the agreement. █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

97.     No one entering into such an agreement could have reasonably believed it had a license to publicly perform the works, ████████████████████ ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

98.     Thus, the ████████ license was not only clear about what uses the license did cover and what it did not cover, but it also provided instruction to the licensee about what additional, separate licenses it might require for its activities. A licensee would have to be willfully blind to such language to believe that (i) it had a license to publicly perform the works licensed solely for reproduction and that (ii) it did not need to obtain a public performance license from each "███████████████████████" in each "████████████" in which the works were to be performed.

99.     It strains credulity for IFP to now claim that it was unaware of these territorial restrictions and that it would be reasonable to believe that licensing copyrighted works for use in one territory would permit the use of the works in another.

**2.    The foreign agreements Mr. Smith cites that purportedly permit the reproduction and distribution of BMG's copyrighted works (i) do not, in fact, permit IFP to reproduce or distribute such works outside the territory covered by such licenses and (ii) do not, in fact, permit IFP to publicly perform such works anywhere in the world.**

100.    None of the agreements between IFP and *mechanical rights reproduction societies* outside of the United States permit the public performance of BMG's musical works in the United States. Nor could anyone entering into such an agreement have reasonably believed so.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

101.   For  example,  IFP's  application  for  a ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

102.   ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

103.   It would defy common sense for a licensee to believe that it had a license to publicly perform a work, given (i) the licensee had received a license from an entity expressly stating that it controlled only the "████████████████████" in the copyrighted work, (ii) that such entity stated expressly that the licensee had ████ ██████████" to *publicly perform* the work anywhere at all, and (iii) that such entity expressly stated that not only might a public performance license be *separately* required, but identified from whom the licensee could obtain one.

104.   By the same token, to the extent any license form ████████ permitted IFP to reproduce any of BMG's musical works in copies or phonorecords and distribute them, such reproduction and distribution would have been limited to the *territory* set forth in the agreement, which in this case was ████████████████████. Anyone in the business of licensing any kind of copyrighted works would understand that where a license agreement specifies a territory within which the permission applies, that any use outside of the territory would be outside the scope of the license and, therefore, unauthorized by the license.

-33-

105.   Mr. Smith also refers to ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████

106.   In the face of such clear language, no licensee would reasonably believe it had obtained a license to *publicly perform* the sound recordings anywhere, no less than perform them in the United States. ███████████████████████

█████████████████████████████████████████████████████

**3.   The foreign agreements Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's musical works do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted sound recordings anywhere in the world,**

107.   None of the agreements between IFP and representatives of owners of *musical works* (e.g., performance rights organizations or mechanical reproduction collection societies) outside of the United States permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *sound recordings* anywhere in the world. Nor could anyone entering into such an agreement have reasonably believed they did.

108.   Strangely, however, Mr. Smith opines that █████████████████

██████████████████████████████████████████████████████

██████████████████████[11] But, as discussed below, that is simply not the case.

---

[11] Where MCPS/PRS differs from the U.S. is in MCPS/PRS's representation of both the reproduction rights and public performance rights for musical works. MCPS/PRS does not, for the

-34-

1   But to that false premise, he adds that ████████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5       109.   But under the agreement between ████████████████████████

6   ████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████

10  ████████████████████████

11     ████    ██████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ██████████████████ ██ ████████████████████

14      110.   Moreover, in IFP's application for a ██████████████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████

19  ████████████████████████

20      111.   Accordingly, it would not be reasonable for IFP to believe that any

21  license from ██████████████, or other representatives of the *musical works* owned

22  by music publishers would include a license to the *sound recordings* of those works,

23  ───────────────────────────

24  most part, represent sound recordings (except in the limited case of some production music libraries).
    In the U.S., public performance rights are represented by PROs, which remain separate entities from

25  mechanical rights reproduction societies, such as the Harry Fox Agency.

26  [12] ████████████████████████████████████████████████████████████████

27  ████████████ s noted, the musical works in this case, and the works customarily used for
    inflight music, are of *popular songs* performed and recorded by *popular recording artists*, not

28  "production" or "library" music.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

1  which are customarily owned by third party record companies, especially in the case

2  of popular recordings of the kind typically programmed for inflight listening.[13]

3  **4.  The foreign agreements Mr. Smith cites that purportedly permit the**

4  **reproduction, distribution, or public performance of BMG's sound**

5  **recordings do not, in fact, permit IFP to reproduce, distribute, or**

6  **publicly perform any of BMG's copyrighted musical works anywhere**

7  **in the world.**

8  112.   None of the agreements between IFP and a record company or sound

9  recording representative (███████████████████████) permit the

10  reproduction, distribution, or public performance of BMG's *musical works* in the

11  United States or anywhere else in the world. Nor could anyone entering into such an

12  agreement have reasonably believed so.

13  113.   For example, the ███████████████████

14  ████████████████████████████████████

15  ████████████████████████████████████

16  ████████████████████████████████████

17  ████████████████████████████████████

18  ████████████████████████████████████

19  ████████

---

[13] To the extent Mr. Smith refers to "reciprocal benefits," he can only mean that a license from a PRO or mechanical reproduction rights society for the use of music in the PRO's or society's authorized territory may include musical works that *originated* in other territories through reciprocal arrangements with the PRO's or society's counterparts overseas. But this only means that IFP could use the music or recordings originated elsewhere in the local territory authorized by the PRO or society; IFP could not use the music or recordings in any other territory, including the originating territory, without the appropriate reproduction, performance, and/or import license covering such territory. Accordingly, Mr. Smith's statement that "It would seem the source music content, for the purpose of reproduction, had been addressed in the territory where Inflight Productions was based" (Greene Decl., Ex. 50 (Smith Report) at 6) is completely in conflict with both the law of contracts and industry custom and practice that have evolved on the basis of such law. License agreements specify the territories in which the licensed activities are authorized to occur the territory in which the licensee is based is irrelevant for purposes of interpreting the scope of the license.

**5. The foreign agreements Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's copyrighted works outside of the United States does not include a license to import any such works into the United States.**

114. None of the agreements between IFP and representatives of owners of musical works or sound recordings outside of the United States permit IFP to import copies of such works into the United States. Nor could anyone entering into such an agreement have reasonably believed they did.

115. When a license to reproduce a copyrighted work includes a license to *import* copies of the work to a county for such purpose, the license will customarily expressly say so. For example,

116.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

117. ████████████████████████████████████████████

████████████████████████████████████████████

**B.** **That an Airline May Have Breached its Agreement with IFP by Failing to Procure a Public Performance License Does Not Absolve IFP of its Liability for Copyright Infringement.**

118. In the course of offering his opinion, Mr. Smith made the following statement:

- ████████████████████████████████████████

119. Defendants cite at least two agreements with its airline clients purporting to require the airline to procure its own public performance licenses for the inflight performances of sound recordings musical works provided by IFP.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

120. As discussed in my Expert Report dated May 7, 2019, the commercial airline companies (e.g., United Airlines, American Airlines) and the in-flight music service companies that furnish the music (e.g. IFP) are both engaged in effecting public performances of musical works to passengers on an aircraft. See, *Marcus Gray v. Katy Perry,* Case No. 2:15-cv-05642-CAS-JC Civil Minutes—General, Dkt# 246 at 14 (Apr. 3, 2017) (holding that a public performance license covers every person responsible for, or who otherwise contributes to, publicly performing the works). It is the custom and practice of public performance rights organizations ("PROs") to license one or the other. Thus, if an in-flight music service is providing audio content to an airline for its fleet of aircraft, then that service may license public performances for that fleet. If an airline prefers to hold the performance licenses, then the airline may license public performances directly from the PROs.

121. For example, BMI offers two performances licenses for these purposes: (a) for music services, the BMI Aircraft Music Service Agreement and (b) for airlines, the BMI Aircraft Agreement. If the airline chose not to obtain the public performance license, the in-flight music service provider would need to procure both the server copy license and the public performance licenses. That license is readily available from PROs in each of the territories serviced by the aircraft.

122. Accordingly, regardless of whether IFP required its airline partners to have public performance licenses in place, if the airline did not have one in place, then both the airline and IFP would be engaging in the infringement of the copyright owner's exclusive right of public performance. The fact that an airline may have breached its agreement with IFP does not absolve IFP of its liability for copyright infringement.

**C.    IFP's Agreements with** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

123. In the course of offering his opinion, Mr. Smith also made the following statements:

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████

- ███████████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████████
  █████████████████████

124. ███████████████████████████████████

███████████████████████████████████████████

████████████████████████████ On June 20, 2016, a federal court in Los Angeles held IFP liable for willfully infringing the copyrights of Universal Music. See, *UMG Recordings v. Global Eagle*, No. 14-cv-3466 (C.D. Cal., Mar. 31, 2016, adopted as final ruling on Apr. 20, 2016). █████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

125. Given the timing, it would be perverse to believe that these agreements were entered out of an innocent and admirable "desire to ensure full compliance." On the contrary, IFP was caught in the act of willful infringement and had no alternative but to pay the piper for failing to comply with the copyright law. See, definition of "piper," *Oxford Dictionary* ("We will have to pay the piper, and the price tag is apt to be a high one").

**D.    If IFP Had Wished to Ensure Compliance with U.S. Copyright Law,**

**It Could Simply Have Withheld the Use of BMG's Songs and Recordings Until It Obtained the Required Licenses**

126.   If IFP truly desired "████████████████████" with the U.S. copyright law, it need only have abstained from the reproduction, distribution, importation and public performance of BMG's works until it procured the required licenses to do so.

127.   Mr. Smith also opines:

- ████████████████████████████████████████████ ████████████████████████████████████████████ ████████

128.   Mr. Smith does not identify the "████████████████" to which he refers. If IFP truly adhered to "████████████████" it would have included one of the most important security protocols to which a music service provider could adhere: including in its metadata appropriate fields that indicate whether the required licenses were in place for a song or recording it wished to reproduce, distribute, import, and publicly perform in the United States.

129.   It has become common practice for music service providers like IFP to withhold the use of musical works and recordings for which valid licenses were not in place. Even on a large scale involving millions of tracks, this can be accomplished by controlling the metadata associated with such works, marking for reproduction, distribution and performance only those songs and recordings for which valid licenses had been procured.   This has become the custom and practice of music service providers who take seriously their obligations to respect the copyrights of works they seek to exploit with their services. Certainly, given that inflight music services involve the programming of just hundreds, not millions, of popular recordings, it should have been a simple matter to track whether the appropriate licenses had been in place for the songs and recordings IFP wished to deploy in its service.

**V.  Response to Mr. Torremans's Expert Rebuttal Report**

130.   Nothing in the Torremans Report has prompted me to change any of the opinions I submitted in the Kohn Report or Kohn Rebuttal Report. Insofar as I can tell, Mr. Torremans offers two primary opinions:

- ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████

- ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████

131.   I will address each of these as follows, but, at the outset, it should be pointed out that Mr. Torremans does not at all refute my contention that (i) IFP required an import license for the importation of any copyrighted works into the United States and (ii) since IFP has not produced such an import license and since its own witness was not aware of any, it seems clear IFP never procured one. Accordingly, without the required import license, the importation of BMG's copyrighted works would constitute an infringement of copyright.

**A.     Whether IFP Reproduced Phonorecords of BMG's Works "from 2014 to the present" Solely Outside of the United States Is a Question of Fact; IFP Is Not Refuting BMG's Allegation that IFP Did Reproduce Phonorecords of BMG's Works Inside the United States Prior to 2014.**

132.   Mr. Torremans stated that the Kohn Report ██████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ But in later in his report, Mr. Torremans ███████████████████████████ ████████████████████████████████████████████ Moreover, Mr. Torremans does ████████████████████████████████

-42-

1    not refute BMG's allegation that that IFP did reproduce phonorecords of BMG's

2    sound recordings and musical works inside the United States prior to 2014.

3       133.   ████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████   ████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ██████████████████████   Though the reproduction of the recordings and

11   songs may have been incidental to the *listening* of them for curation purposes, it has

12   been clear since at least as early as 2009 that interactive streaming of sound recordings

13   constitutes an *incidental* digital phonorecord delivery *by or for* the intended recipient

14   (as opposed to a digital phonorecord delivery *in general*). The Music Modernization

15   Act of 2018 eliminated the distinction between *incidental* and *general* digital

16   phonorecord deliveries and now defines "digital phonorecord deliveries" as including

17   interactive streams. 17 U.S.C. §115(e)(10) (post-2018 Act). Interactive streams made

18   without authorization is an infringement of the copyright owner's exclusive right of

19   *reproduction* under Section 106(1).

20      134.   Finally, the Kohn Report does, in fact, take into account the possibility

21   that IFP's reproduction occurred outside of the United States in that, the Report makes

22   clear that, even if no reproduction of BMG's works occurred inside the United States,

23   IFP would still require a license to ***import*** such reproductions into the United States

24   for the purpose of facilitating the distribution and/or public performances of such

25   works within the United States. Neither IFP nor Mr. Torremans has produced a single

26   import license that would have authorized the importation of BMG's works into the

27   United States.

28     **B.**   **Whether   Procuring   a   Public   Performance   License   Was   the**

**Responsibility of IFP's Airline Clients Is Irrelevant Except Insofar as IFP May Have An Action Against Its Clients for Failing to Do So.**

135.   As noted, Mr. Torremans ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████ Yet, regardless of whether IFP required its airline partners to have public performance licenses in place, if the airline did not have one in place, then both the airline and IFP would be engaging in the infringement of the copyright owner's exclusive right of public performance. The fact that an airline may have breached its agreement with IFP does not absolve IFP of its liability for copyright infringement.

136.   In addition, even if IFP procured public performance licenses in the United States covering all relevant timeframes in this matter, those public performances licenses did not authorize the importation or distribution of BMG's copyrighted works into and within the United States.

**C.   IFP Required a License to *Import* BMG's Works into the United States, Even if During the Relevant Period (i) All of IFP's Reproduction of BMG's Copyrighted Works Occurred Outside of the United States and (ii) IFP had Procured All Necessary Valid Licenses to Publicly Perform Such Works in the United States.**

137.   As noted, owing to the *divisibility of copyright,* an in-flight music service provider will require not only a reproduction license (e.g., server copy license) under the copyright owner's exclusive right of reproduction (§106(1)) and a public performance license under the copyright owner's exclusive right of public performance (§106(4) or (6)), but also a distribution license under the copyright owner's exclusive right of distribution (§106(3)). Importing copies or phonorecords into the United States without authorization of the copyright owner, even where the reproduction of such copies or phonorecords was lawfully done overseas, is an

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

infringement of the copyright owner's exclusive right of distribution, actionable under Section 501. 17 U.S.C. §602(a)(1) and (2).

138.   As noted, due to the divisibility of copyright, each of these acts (e.g., reproduction, public performance, importation or distribution) requires a separate license, which may be administered directly by the copyright owner or by various agents under its authority, and the fact that a licensee is licensed to do one of these acts does not automatically mean the licensee is authorized to do another.

139.   For example, even though IFP may have procured a valid license to reproduce phonorecords of BMG's works outside of the United States and a valid license to publicly perform BMG's musical works inside the United States, it would still require a license to import such reproductions for purposes of using the phonorecords for inflight performance in the United States.

140.   As noted, public performance licenses do not include reproduction or distribution licenses.  Indeed, they will often expressly state that no reproduction or distribution license is included with the public performance license. ████████████

████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

142.   IFP's 30(b)(6) witness, Mr. Jeff Borgeson, ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██

███ ████████████████████████████████████

█████████████████████

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

143.   Moreover, Mr. Borgeson █████████████████
███████████████████████████████████████████████
█████

144.   I understand that additional reports and depositions of experts and other witnesses may be conducted in this matter.  I plan on reviewing their deposition transcripts when they become available and reserve the right to supplement or amend this declaration after such review. I also reserve the right to supplement or modify this declaration and the opinions expressed based upon additional facts, documents, or other materials that may be brought to my attention.

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my ability and that this declaration was executed on the date set forth below in New York, NY.

Respectfully submitted,

June 17, 2019

_____

Date

_____

Robert H. Kohn

DECLARATION OF ROBERT H. KOHN IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT