EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **BMG RIGHTS MANAGEMENT (US) LLC, a Delaware limited liability Company,** | \| **Case No. 2:18-cv-03723** |
| **Plaintiff,** | \| |
| **v.** | \| |
| **GLOBAL EAGLE ENTERTAINMENT, INC., a Delaware Corporation; INFLIGHT PRODUCTIONS LTD, a UK private limited company; and DOES 1-10, inclusive,** | \| |
| **Defendants.** | \| |

## EXPERT WITNESS REBUTTAL REPORT OF

## BOB KOHN

## May 21, 2019

TABLE OF CONTENTS

I.   Expert's Assignment.................................................................................................... 3

II.  Response to Mr. Smith's Report ................................................................................ 3

    A.   IFP Could Not Have Reasonably Relied on License Agreements from Rights Organizations Outside of the United States to Permit IFP to Reproduce, Distribute or Publicly Perform BMG's Copyrighted Works Inside the U.S........................................ 3

        1.   The foreign agreements that Mr. Smith cites that purportedly permit the *public performance* of BMG's copyrighted works (i) do not permit IFP to publicly perform such works outside the territory covered by such licenses and (ii) do not permit IFP to *reproduce* or *distribute* such works anywhere in the world. ............... 6

        2.   The foreign agreements that Mr. Smith cites that purportedly permit the *reproduction and distribution* of BMG's copyrighted works (i) do not, in fact, permit IFP to reproduce or distribute such works outside the territory covered by such licenses and (ii) do not, in fact, permit IFP to *publicly perform* such works anywhere in the world.............................................................................................. 8

        3.   The foreign licenses Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's *musical works* do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *sound recordings* anywhere in the world, ........................................................................ 10

        4.   The foreign licenses Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's *sound recordings* do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *musical works* anywhere in the world.................................................................... 12

        5.   The foreign licenses that Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's copyrighted works outside of the United States does not include a license to *import* any such works into the United States. ................................................................................................. 12

    B.   That an Airline May Have Breached its Agreement with IFP by Failing to Procure a Public Performance License Does Not Absolve IFP of its Liability for Copyright Infringement............................................................................................................. 14

    C.   IFP's Agreements with Sony Music, Universal Music, and Warner Music Were Entered Into, *Because* IFP Was Previously Found to Have Infringed Copyrights ....... 15

    D.   If IFP Had Wished to Ensure Compliance with U.S. Copyright Law, It Could Simply Have Withheld the Use of BMG's Songs and Recordings Until It Obtained the Required Licenses ...................................................................................................... 16

## I. Expert's Assignment

My assignment in this rebuttal report was to assess and, to the extent necessary in light of the areas of my expertise, respond to the expert report of Jeremy Smith ("Smith Report") submitted by Defendants on May 7, 2019.

## II. Response to Mr. Smith's Report

Nothing in the Smith Report has prompted me to change any of the opinions I submitted in the Kohn Report dated May 7, 2019 ("Kohn Report"). I respond to several of Mr. Smith's salient opinions as follows.

**A.  IFP Could Not Have Reasonably Relied on License Agreements from Rights Organizations Outside of the United States to Permit IFP to Reproduce, Distribute or Publicly Perform BMG's Copyrighted Works Inside the U.S.**

Mr. Smith opines that:



- ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████ Smith Expert Report at 3.

- ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████ Id at 5.

- ████████████████████████████████████████
████████████████████████████████████████
███████████████ Id at 6.

Mr. Smith's opinion fails because (a) the clear and unambiguous language of each of the licenses upon which IFP purports to rely expressly preclude the use of BMG's copyrighted works in any manner outside the scope of such licenses, (b) each of such

licenses follow well established and well known music industry customs and practices with respect to their limited scope and terms, and (c) IFP appears to have been well aware of those customs and practices and, to the extent it wasn't, it should have been, given that a fundamental aspect of its business, and significant benefit offered to its clients, is the clearance of the required licenses for inflight use of musical works and sound recordings.

The foreign licenses that Mr. Smith cites that purportedly permit the *public performance* of BMG's copyrighted works (i) do not, in fact, permit IFP to publicly perform such works outside the territory covered by such licenses and (ii) do not, in fact, permit IFP to *reproduce* or *distribute* such works anywhere in the world. By the same token, the foreign licenses that Mr. Smith cites that purportedly permit the *reproduction and distribution* of BMG's copyrighted works (i) do not, in fact, permit IFP to reproduce or distribute such works outside the territory covered by such licenses and (ii) do not, in fact, permit IFP to *publicly perform* such works anywhere in the world.

Moreover, any foreign licenses that Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's *musical works* do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *sound recordings* anywhere in the world. By the same token, any foreign licenses that Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's *sound recordings* do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *musical works* anywhere in the world.

Finally, any foreign licenses that Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's copyrighted works outside of

the United States do not, in fact, include a license to *import* any such works into the United States.

The limited scope and restrictions set forth in the foreign agreements cited by Mr. Smith follow well-known industry customs and practices. For example, a licensed granted by a performance rights organization ("PRO") to publicly perform a musical work will customarily *not* include a license to reproduce or distribute the work. By the same token, a licensed granted by a mechanical rights collection society to reproduce and distribute a musical work will customarily *not* include a license to publicly perform the work. A license to perform a musical work inside of the licensed territory does customarily *not* permit the performance of the work outside of the licensed territory. And, a license to reproduce, distribute, and/or publicly perform a sound recording will customarily *not* include a license to reproduce, distribute, and/or publicly perform any musical work or works that may be embodied in that sound recording.[1]

Indeed, these well-established customs and practices were spelled out in lay terms in a brochure produced by IFP in this case entitled " █████████████████████ █████████████ " published jointly by █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ GEE0010628. That brochure makes clear the distinction between *musical works* and *sound recordings*, and the further distinction between

---

[1] Production music libraries, which often control the rights to both the sound recordings and the musical works embodied in those recordings, may grant a license for the use of both the recording and the musical work, but the works in this case, and the works generally used for inflight music, are of popular songs and recording artists, not production or "background" music. In some countries, especially those comprising smaller, specialized music markets, such as in the Middle East, the functions of a record company and music publisher are often combined. See, for example, IFP's agreement with ███████████████, a company that controls a catalog of both sound recordings and musical works of popular ██████ songs performed by popular recording artists. GEE0000305.

*reproduction rights* and *public performance rights*, each licensable under the authority of different copyrights or different exclusive rights under copyright, often licensed and administered by different organizations (e.g., for a *sound recording*, a record company who owns or controls it, or its representative, such as a sound recording performance organization; for a *musical work*, a music publisher or its representatives, such as a mechanical reproduction rights society for exercising the publisher's exclusive rights of reproduction and distribution and a performance rights organization (or "PRO") for exercising the publisher's exclusive right of public performance), who may be authorized to grant licenses for use in a specific territory (e.g., to publicly perform a musical work in Australia and New Zealand, but not in any other countries, such as the United States).

Mr. Smith does not point to any evidence that IFP did, in fact, rely on its foreign agreements to reproduce, distribute, or publicly perform BMG's copyrighted works. And, for the reasons set forth herein, any such reliance would not have been reasonable.

1. **The foreign agreements that Mr. Smith cites that purportedly permit the *public performance* of BMG's copyrighted works (i) do not permit IFP to publicly perform such works outside the territory covered by such licenses and (ii) do not permit IFP to *reproduce* or *distribute* such works anywhere in the world.**

None of the agreements between IFP and *performance rights organizations (PROs)* outside of the United States permit the *reproduction or distribution* BMG's musical works in (or import into) the United States. Nor could anyone entering into such an agreement have reasonably believed so.

For example, Mr. Smith refers to an agreement between IFP and ▇▇▇ under which IFP acquired a license to reproduce and distribute the repertoire of musical works represented by ▇▇▇. GEE0000101. But that agreement was specifically limited to the

territory covered by the license.  With respect to the *reproduction* of the musical works, the territory within which such reproduction was permitted was limited to ███████ ███████. GEE0000108-109. With respect the *distribution* of copies or phonorecords reproduced under the authority of such license, the territory was limited to ███████ ███████████████. Id. No permission was granted to reproduce or distribute copies outside of ██████, such as in or to the United States, and it would be unreasonable for any licensee to think it was authorized to do so.

Moreover, it would be unreasonable for any such licensee to reasonably believe it was authorized by ██████ to *publicly perform* any of the musical works otherwise licensed under the agreement. The agreement specifically states,



” GEE0000110.

No one entering into such an agreement could have reasonably believed it had a license to publicly perform the works, even in the ███████████████. Moreover, Section 3.3 of the agreement continues:



Id.

Thus, the ██████ license was not only clear about what uses the license did cover and what it did not cover, but it also provided instruction to the licensee about what additional, separate licenses it might require for its activities. A licensee would have to be willfully blind to such language to believe that (i) it had a license to publicly perform the

works licensed solely for reproduction and that (ii) it did not need to obtain a public performance license from each "relevant performing right society" in each "relevant country" in which the works were to be performed.

It strains credulity for IFP to now claim that it was unaware of these territorial restrictions and that it would be reasonable to believe that licensing copyrighted works for use in one territory would permit the use of the works in another.

2. **The foreign agreements that Mr. Smith cites that purportedly permit the _reproduction and distribution_ of BMG's copyrighted works (i) do not, in fact, permit IFP to reproduce or distribute such works outside the territory covered by such licenses and (ii) do not, in fact, permit IFP to _publicly perform_ such works anywhere in the world.**

None of the agreements between IFP and _mechanical rights reproduction societies_ outside of the United States permit the public performance of BMG's musical works in the United States. Nor could anyone entering into such an agreement have reasonably believed so.

For example, IFP's application for a ▮▮▮▮▮▮▮▮▮▮▮ License from the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ states, at the outset, that ▮▮▮▮▮'s representation of music publishers in ▮▮▮▮▮▮▮▮▮▮ is specifically limited to "▮▮▮▮▮▮▮▮▮▮▮▮▮" GEE0010622. Nowhere does the agreement suggest that ▮▮▮▮ has any right to license the _public performance_ of the musical works subject to the license.

Indeed, in the "▮▮▮▮▮" section just above IFP's authorized signature, the agreement makes it clear that "▮▮▮▮▮▮" is given to communicate or "▮▮▮▮ ▮▮▮▮▮▮▮▮▮" GEE0010626. Moreover, the agreement further states that "▮

██████████████████████████████████████████████████

████████████████████████████████" GEE0010627.

It would defy common sense for a licensee to believe that it had a license to publicly perform a work, given (i) the licensee had received a license from an entity expressly stating that it controlled only the "████████████████" in the copyrighted work, (ii) that such entity stated expressly that the licensee had "████████████" to *publicly perform* the work anywhere at all, and (iii) that such entity expressly stated that not only might a public performance license be *separately* required, but identified from whom the licensee could obtain one.

By the same token, to the extent any license form ████████ permitted IFP to reproduce any of BMG's musical works in copies or phonorecords and distribute them, such reproduction and distribution would have been limited to the *territory* set forth in the agreement, which in this case was ████████████████. Anyone in the business of licensing any kind of copyrighted works would understand that where a license agreement specifies a territory within which the permission applies, that any use outside of the territory would be outside the scope of the license and, therefore, unauthorized by the license.

Mr. Smith also refers to the Inflight Entertainment License between IFP and ████████████████████████████. But that agreement is strictly and expressly limited to the *reproduction* of sound recordings for the purpose of storing them on servers to place on aircraft. GEE0000146, GEE0000151. The agreement then states in no uncertain terms:

████████████████████████████████████

██████████████████████████████████████████GEE0000151.

In the face of such clear language, no licensee would reasonably believe it had obtained a license to *publicly perform* the sound recordings anywhere, no less than perform them in the United States. Indeed, even the reproduction and distribution aspects of the license were limited to the territory of ████. GEE0000150.

3. **The foreign licenses Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's *musical works* do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *sound recordings* anywhere in the world,**

None of the agreements between IFP and representatives of owners of *musical works* (e.g., performance rights organizations or mechanical reproduction collection societies) outside of the United States permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *sound recordings* anywhere in the world. Nor could anyone entering into such an agreement have reasonably believed they did.

Strangely, however, Mr. Smith opines that



"[2] But, as discussed below, that is simply not the case. But to that false premise, he adds ████████████████████████████████████ and, from that, he concludes, "████████████████████████████████████████████████████████"

But under the agreement between IFP and ████, IFP acquired a license to reproduce and distribute the repertoire of musical works, and only *musical works*,

---

[22] Where ████ differs from the U.S. is in ████'s representation of both the reproduction rights and public performance rights for musical works. ████ does not, for the most part, represent sound recordings (except in the limited case of some production music libraries). In the U.S., public performance rights are represented by PROs, which remain separate entities from mechanical rights reproduction societies, such as the Harry Fox Agency.

represented by ███. GEE0000101. The Repertoire Works covered by the license was defined to mean "████████████████████████████████████████████████ ███. GEE0000107. The agreement then states in no uncertain terms,



███ [3] GEE0000112.

  Moreover, in IFP's application for a ████████████████ License ███████ ████████████████████████████████████████, the application is for the reproduction of "████████" [GEE0010622] and specifically states that the "████████████████████████████████████████████ ████████████████████████" GEE0010626.

  Accordingly, it would not be reasonable for IFP to believe that any license from ████████, or other representatives of the *musical works* owned by music publishers would include a license to the *sound recordings* of those works, which are customarily owned by third party record companies, especially in the case of popular recordings of the kind typically programmed for inflight listening. [4]

---

[3] As noted, ████████ may represent the licensing of sound recordings only in the limited case of so-called "████████" or "████████" music that it has been authorized to represent. GEE0000107. As noted, the musical works in this case, and the works customarily used for inflight music, are of *popular songs* performed and recorded by *popular recording artists*, not "████████" or "████████" music.

[4] To the extent Mr. Smith refers to "████████████," he can only mean that a license from a PRO or mechanical reproduction rights society for the use of music in the PRO's or society's authorized territory may include musical works that *originated* in other territories through reciprocal arrangements with the PRO's or society's counterparts overseas. But this only means that IFP could use the music or recordings originated elsewhere in the local territory authorized by the PRO or society; IFP could not use the music or recordings in any other territory, including the originating territory, without the appropriate reproduction, performance, and/or import license covering such territory. Accordingly, Mr. Smith's statement that ████████ ████████████████████████████████████████████████" [Smith Report at 6] is completely in conflict with both the law of contracts and industry custom and practice that have evolved on the basis of such law. License agreements specify the territories in which the licensed activities are authorized to occur the territory in which the licensee is based is irrelevant for purposes of interpreting the scope of the license.

4. **The foreign licenses Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's *sound recordings* do not, in fact, permit IFP to reproduce, distribute, or publicly perform any of BMG's copyrighted *musical works* anywhere in the world.**

None of the agreements between IFP and a record company or sound recording representative (e.g., RIPS in Singapore, PPL in U.K.) permit the reproduction, distribution, or public performance of BMG's *musical works* in the United States or anywhere else in the world. Nor could anyone entering into such an agreement have reasonably believed so.

For example, the Agreement for the ████████████████████████████ ████ between IFP and ██████████████████████████████████ ██████████████ purportedly provides a license to IFP to reproduce certain *sound recordings* in catalogs controlled by certain listed record companies [GEE0000269], but specifically states that it does not include any license to reproduce or publicly perform any *musical works* underlying those recordings:



GEE0000276.

5. **The foreign licenses that Mr. Smith cites that purportedly permit the reproduction, distribution, or public performance of BMG's copyrighted works outside of the United States does not include a license to *import* any such works into the United States.**

None of the agreements between IFP and representatives of owners of musical works or sound recordings outside of the United States permit IFP to import copies of such

-12-

works into the United States. Nor could anyone entering into such an agreement have reasonably believed they did.

When a license to reproduce a copyrighted work includes a license to *import* copies of the work to a county for such purpose, the license will customarily expressly say so. For example, among the rights granted by ███ in its license with IFP is the non-exclusive license "██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████ GEE0000109.

The ████████████████ into which IFP was licensed by IFP to import copies of musical works was limited by the ██████ agreement to "████████████████ ████████████████████████████████████ ████████" Since IFP has produced no evidence that ████ or ███ has notified IFP that it was permitted to import copies to the United States, it would not be reasonable for IFP to believe that it had a license to do so from ██████.

In IFP's agreement with ████ noted above, whatever right IFP had to use the sound recordings licensed from ████, that license was limited to the territory set forth in the agreement: "██████████████████████████████████████████ ████████" GEE000270. The Territory was defined as "████████████" GEE000269. Accordingly, since no license was provided to reproduce or distribute the recordings outside of ██████, no license was granted to import such copies to the United States.

-13-

**B.      That an Airline May Have Breached its Agreement with IFP by Failing to Procure a Public Performance License Does Not Absolve IFP of its Liability for Copyright Infringement.**

In the course of offering his opinion, Mr. Smith made the following statement:

- ███████████████████████████████████████
  █████████████████ Smith Report at 6.

As discussed in my Expert Report dated May 7, 2019, the commercial airline companies (e.g., United Airlines, American Airlines) and the in-flight music service companies that furnish the music (e.g. IFP) are both engaged in effecting public performances of musical works to passengers on an aircraft. It is the custom and practice of public performance rights organizations ("PROs") to license one or the other. Thus, if an in-flight music service is providing audio content to an airline for its fleet of aircraft, then that service may license public performances for that fleet. If an airline prefers to hold the performance licenses, then the airline may license public performances directly from the PROs.

For example, BMI offers two performances licenses for these purposes: (a) for music services, the BMI Aircraft Music Service Agreement and (b) for airlines, the BMI Aircraft Agreement. If the airline chose not to obtain the public performance license, the in-flight music service provider would need to procure both the server copy license and the public performance licenses. That license is readily available from PROs in each of the territories serviced by the aircraft.

Accordingly, regardless of whether IFP required its airline partners to have public performance licenses in place, if the airline did not have one in place, then both the airline and IFP would be engaging in the infringement of the copyright owner's exclusive right of

public performance. The fact that an airline may have breached its agreement with IFP does not absolve IFP of its liability for copyright infringement.

**C.     IFP's Agreements with Sony Music, Universal Music, and Warner Music Were Entered Into, *Because* IFP Was Previously Found to Have Infringed Copyrights**

In the course of offering his opinion, Mr. Smith also made the following statements:



- ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████ Smith Report at
  6.
- ███████████████████████████████████
  ███████████████████████████████████
  ███████████████████████████████████
  █████████████████ Id.

IFP's agreement with Sony Music dated February 1, 2015 was entered only ***after*** IFP was sued by Sony Music in 2013 and by Universal Music Group in 2014 for willful infringement of copyright. On June 20, 2016, a federal court in Los Angeles held IFP liable for willfully infringing the copyrights of Universal Music. See, *UMG Recordings v. Global Eagle*, No. 14-cv-3466 (C.D. Cal., Mar. 31, 2016, adopted as final ruling on Apr. 20, 2016). IFP didn't enter into a license agreement with Universal Music until March 9, 2017, nearly a year ***after*** the court entered its judgment against IFP for willful copyright infringement. And only after did IFP get sued by both Sony Music and Universal Music did they enter into its term sheet with Warner Music.

Given the timing, it would be perverse to believe that these agreements were entered out of an innocent and admirable "███████████████████████" On the

contrary, IFP was caught in the act of willful infringement and had no alternative but to pay the piper for failing to comply with the copyright law. See, definition of "piper," *Oxford Dictionary* ("We will have to pay the piper, and the price tag is apt to be a high one").

**D.     If IFP Had Wished to Ensure Compliance with U.S. Copyright Law, It Could Simply Have Withheld the Use of BMG's Songs and Recordings Until It Obtained the Required Licenses**

If IFP truly desired "███████████████████" with the U.S. copyright law, it need only have abstained from the reproduction, distribution, importation and public performance of BMG's works until it procured the required licenses to do so.

Mr. Smith also opines:

- ████████████████████████████████
  ████████████████████████████████
  █████

Mr. Smith does not identify the "██████████████████" to which he refers. If IFP truly adhered to "████████████████" it would have included one of the most important security protocols to which a music service provider could adhere: including in its metadata appropriate fields that indicate whether the required licenses were in place for a song or recording it wished to reproduce, distribute, import, and publicly perform in the United States.

It has become common practice for music service providers like IFP to withhold the use of musical works and recordings for which valid licenses were not in place. Even on a large scale involving millions of tracks, this can be accomplished by controlling the metadata associated with such works, marking for reproduction, distribution and

performance only those songs and recordings for which valid licenses had been procured. This has become the custom and practice of music service providers who take seriously their obligations to respect the copyrights of works they seek to exploit with their services. Certainly, given that inflight music services involve the programming of just hundreds, not millions, of popular recordings, it should have been a simple matter to track whether the appropriate licenses had been in place for the songs and recordings IFP wished to deploy in its service.

I reserve the right to use all materials considered in preparing this report, including without limitation the materials described in the foregoing sections. I understand that additional reports and depositions of experts and other witnesses may be conducted in this matter. I plan on reviewing their deposition transcripts when they become available and reserve the right to supplement or amend this report after such review. Finally, I reserve the right to supplement or modify this report and the opinions expressed based upon additional facts, documents, or other materials that may be brought to my attention.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my ability and that this report was executed on the date set forth below in New York, NY.

Respectfully submitted,

May 21, 2019
Date

Robert H. Kohn

-18-